This Opinion Is a
Precedent of the TTAB

Hearing: May 29, 2019                                    Mailed: September 30, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*Chutter, Inc.*
*v.*
*Great Management Group, LLC*

Opposition No. 91223018

————

*Chutter, Inc.*
*v.*
*Great Concepts, LLC*

Cancellation No. 92061951

————

Bruce W. Baber and Kathleen E. McCarthy of King & Spalding LLP,
         for Chutter, Inc.

Lisel M. Ferguson and Matthew Shields of Procopio, Cory, Hargreaves & Savitch
         LLP, for Great Management Group, LLC and Great Concepts, LLC.

————

Before Bergsman, Adlin and Coggins, Administrative Trademark Judges.

Opinion by Bergsman, Administrative Trademark Judge:


Great Management Group, LLC seeks registration on the Principal Register of the

mark DANTANNA'S (standard character format) for "spices and spice rubs," in Class

30,[1] and DANTANNA'S TAVERN (standard character format) for "restaurant and bar services," in Class 43.[2] In each application, Great Management Group claimed ownership of Registration No. 2929764 by Great Concepts, LLC for the mark DANTANNA'S (typed drawing form) for "steak and seafood restaurant," in Class 43.[3]

Chutter, Inc. ("Plaintiff") has opposed both applications on two grounds: that DANTANNA'S and DANTANNA'S TAVERN so resemble Plaintiff's previously used mark DAN TANA'S for restaurant services and marinara sauce as to be likely to cause confusion under Section 2(d) of the Trademark Act, 15 U.S.C. §1052(d); and Great Management's applied-for marks falsely suggest a connection or affiliation with Plaintiff or Plaintiff's predecessor-in-interest, Dan Tana, under Section 2(a) of the Trademark Act, 15 U.S.C. §1052(a).

Plaintiff also filed a petition to cancel Registration No. 2929764 on the ground of fraud. Plaintiff alleges, and there is no dispute, that Great Concepts filed in the registration a Combined Declaration of Use and Incontestability under Sections 8 and 15 of the Trademark Act, 15 U.S.C. §§ 1058 and 1065, on March 8, 2010 declaring that "there is no proceeding involving said rights pending and not disposed of either in the U.S. Patent and Trademark Office or in the courts," even though a prior

---

[1] Application Serial No. 86434445 was filed on October 24, 2014, under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), based on Great Management Group's claim that it first used the mark anywhere and in commerce as of January 1, 2014.

[2] Application Serial No. 86434461 was filed on October 24, 2014, under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), based on Great Management Group's claim that it first used the mark anywhere and in commerce as of August 1, 2014. Great Management Group disclaimed the exclusive right to use the word "Tavern."

[3] Registered March 1, 2005; renewed.

cancellation proceeding (No. 92045947) and a civil action in the United States District Court for the Northern District of Georgia (Civil Action No. 1:08-CV-975-TWT) were pending against Great Concepts' right to register and use the mark DANTANNA'S. Plaintiff further alleges that because Great Concepts knew that the two proceedings were pending when it filed its Combined Declaration, its statement that there were no pending proceedings was knowingly false. Plaintiff alleges that Great Concepts "made the false statement in the Declaration with the intent that the USPTO would rely on it and to induce the USPTO to accept the Declaration."[4]

Great Concepts, in its Answer, denied the salient allegations of the Petition for Cancellation.

Great Management Group, in its Answer, denied the salient allegations of the Notice of Opposition.

## I. Background

In a September 27, 2016 order, the Board consolidated the Opposition and Cancellation because the parties, or their privies, are the same and the pleaded or subject marks are the same or similar. "Inasmuch as the proceedings involve common questions of law and fact, consolidation of the proceedings is appropriate."[5] To aid our discussion, we first provide detail regarding the relationship between the respective

---

[4] Petition for Cancellation ¶36 (1 TTABVUE 9).

[5] 18 TTABVUE 13 (Opposition No. 91223018); 14 TTABVUE 13 (Cancellation No. 92061951). After consolidation the record was maintained in the opposition file. Citations to the record hereafter are to the file in Opposition No. 91223018.

Citations to TTABVUE refer to the Board's online docket system. *See, e.g.*, *New Era Cap Co. v. Pro Era, LLC*, 2020 USPQ2d 10596, at *2 n.1 (TTAB 2020).

Defendants Great Management Group and Great Concepts, and David Clapp and other entities related to Defendants.

In the opposed applications, both filed on October 24, 2014, Great Management Group claimed ownership of Great Concepts' Registration No. 2929764 for the mark DANTANNA'S for "steak and seafood restaurant."[6] Less than two weeks later, on November 4, 2014, Great Concepts filed a Combined Declaration of Use/Application for Renewal for that registration. David Clapp is the Member, Manager, and owner of both Defendants and other related entities, all listed below:

(i)  Great Concepts, the defendant in the cancellation proceeding;

(ii) Dantanna's CNN Center, LLC;

(iii) Dantanna's Tavern LLC;

(iv) Great Management Group, the defendant in the opposition proceeding; and

(v)  Great Management Services, LLC.[7]

Mr. Clapp testified that he was unaware of any possible inconsistency (e.g., different owner names) between the claim by Great Management Group to ownership of the Great Concepts registration and the application for renewal of that registration filed in the name of Great Concepts.[8]

---

[6] "If an applicant includes a claim of ownership of a prior registration, or a pending application, in the application as filed, the examining attorney must accept the claim without further proof of ownership and must not cite the registration for likelihood of confusion under §2(d) of the Act or advise the applicant that there may be a conflict with the earlier-filed application." TRADEMARK MANUAL OF EXAMINING PROCEDURE (TMEP) § 812.01 (2021).

[7] Clapp Discovery Dep., p. 7 (32 TTABVUE 10).

[8] Clapp Discovery Dep., p. 142 (32 TTABVUE 145).

Great Concepts operates a DANTANNA'S restaurant located in the Buckhead section of Atlanta, Georgia.[9] Dantanna's CNN Center operates a DANTANNA'S restaurant in the CNN Center in Atlanta.[10] Dantanna's Tavern, LLC operates a DANTANNA'S restaurant in the Sandy Springs section of Atlanta.[11] The DANTANNA'S restaurant in Sandy Springs operated by Dantanna's Tavern, LLC was originally called DANTANNA'S TAVERN. Sometime in 2016, it stopped using the word "Tavern." The mark DANTANNA'S TAVERN is not currently being used.[12] Mr. Clapp considers that to be a permanent change and he has no plans to resume use of DANTANNA'S TAVERN.[13]

David Clapp formed both Great Management Group LLC and Great Management Services, LLC to manage the three restaurants. Great Management Group provides services to the three restaurants in the nature of paying bills, accounting and other back-office services;[14] it is essentially an alter ego for David Clapp.[15] Great Management Services is also a management company, and consists of a President, corporate chef, and sales manager who provide business and restaurant related services to the three restaurants.[16] In essence, there are two management companies

---

[9] *Id.* at p. 20 (32 TTABVUE 23).

[10] *Id.*

[11] *Id.*

[12] *Id.* at pp. 22-23, 28 (32 TTABVUE 25-26, 31).

[13] *Id.* at pp. 28-29 and 108-109 (32 TTABVUE 31-32 and 111-112). *See also id.* at pp. 93-94, 131 (32 TTABVUE 96-97, 134).

[14] *Id.* at p. 23 (32 TTABVUE 26).

[15] *Id.*

[16] *Id.* at pp. 23-24 (32 TTABVUE 26-27).

(Great Management Group and Great Management Services) that oversee the three DANTANNA'S restaurants whose day-to-day operations are run by three separate entities (Great Concepts, Dantanna's CNN Center, and Dantanna's Tavern).[17] According to Mr. Clapp, Great Management Group and Great Management Services – "they're all the same."[18] There are no written agreements between any of the companies.[19]

## II. Preliminary Issue

The essence of Plaintiff's pleaded fraud claim seeking cancellation of Defendant Great Concepts' Registration No. 2929764 is that the admittedly false statement made by Great Concepts' counsel, Frederick K. Taylor, to the USPTO on behalf of Great Concepts – that there were no civil actions or USPTO proceedings pending against Great Concepts' DANTANNA'S mark and registration for "steak and seafood restaurant" – was made with the intent to deceive the USPTO into accepting the Combined Declaration of Use and Incontestability. Earlier, Plaintiff unsuccessfully attempted to amend the fraud claim, and later renewed the attempt in its brief. Thus, we briefly address Plaintiff's purported amendment.

On June 6, 2018, Plaintiff filed a motion to amend the Petition for Cancellation to assert additional allegations related to fraud.[20] Specifically, Plaintiff sought to amend the Petition for Cancellation to allege that Great Concepts' counsel did not personally

---

[17] *Id.* at pp. 37-38, 60-61 (32 TTABVUE 40-41, 63-64).

[18] Id. at p. 43 (32 TTABVUE 46).

[19] *Id.* at pp. 38, 47 (32 TTABVUE 41, 50).

[20] 45 TTABVUE.

sign the Combined Declaration under Sections 8 and 15, and that upon learning about the false or incorrect statements in that declaration, Great Concepts did not take any steps to correct the incorrect or false statements.[21]

The Board denied Plaintiff's motion to amend the Petition for Cancellation because Plaintiff did not timely file its motion.[22] Nevertheless, Plaintiff, in its brief, argues that: (1) Great Concepts' failure to correct the false or incorrect statements in the declaration constituted fraud; and (2) Mr. Taylor, although designated as Great Concepts' counsel, did not personally sign the declaration, thereby constituting additional grounds for finding fraud.[23] Because the Board previously and appropriately denied Plaintiff's motion to amend its Petition for Cancellation to assert these additional grounds for the fraud claim, we will not consider either of those allegations as supporting a separate, unpleaded fraud claim; however, we will consider the asserted failure to correct the false statement regarding other proceedings as related to our assessment of Mr. Taylor's intent to deceive the USPTO when he filed the Combined Declaration at issue. *Cf. Space Base Inc. v. Stadis Corp.*, 17 USPQ2d 1216, 1219 (TTAB 1990) ("[A] person can commit fraud upon the Office by willfully failing to correct his or her own misrepresentation, even if originally innocent, as long as that person subsequently learns of the misrepresentation, and

---

[21] Proposed Amended Petition for Cancellation ¶¶56-65 (45 TTABVUE 24-25).

[22] 50 TTABVUE.

[23] Plaintiff's Brief, pp. 29-33 (51 TTABVUE 29-35).

knows that the Office has relied upon that misrepresentation in conferring a substantive benefit upon that person to which the person knows it is not entitled.").

## III. The Record

The record includes the pleadings and, by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), the files for the involved registration and applications.[24] The parties introduced the following testimony and evidence:

A. Plaintiff's testimony and evidence

1. Notice of reliance on the discovery deposition of Frederick K. Taylor, the attorney responsible for filing the Combined Declaration of Use and Incontestability on behalf of Great Concepts;[25]

2. Notice of reliance on the discovery deposition of Leo R. Modelo, the paralegal who assisted Mr. Taylor in preparing and filing the Combined Declaration of Use and Incontestability;[26]

3. Notice of reliance on the discovery deposition of David E. Clapp, the principal of Defendants Great Concepts and Great Management Group;[27]

4. Notice of reliance on the following items:

    a. A copy of Plaintiff's Registration No. 3420716 for the mark DAN TANA'S for "clothings [sic], namely, tee shirts, hats and aprons" printed from the USPTO electronic databases showing the current status of and title to the registration;[28]

---

[24] Accordingly, there was no need for Defendants to file notices of reliance on the Notice of Opposition (42 TTABVUE) and Petition for Cancellation (43 TTABVUE).

[25] 30 TTABVUE.

[26] 31 TTABVUE.

[27] 32 TTABVUE.

[28] 33 TTABVUE 6-57.

b. A copy of the assignment records for Plaintiff's Registration No. 3420716 for the mark DAN TANA'S printed from the USPTO electronic databases;[29]

c. A copy of the prosecution history file for Plaintiff's application Serial No. 86452290 for the mark DAN TANA'S for bar and restaurant services printed from the USPTO electronic databases;[30] and

d. A copy of the prosecution history file for Plaintiff's application Serial No. 86452328 for the mark DAN TANA'S for marinara sauce printed from the USPTO electronic databases;[31]

5. Notice of reliance on Defendant Great Concepts' responses to Plaintiff's first set of interrogatories;[32]

6. Notice of reliance on Defendant Great Management Group's responses to Plaintiff's first set of interrogatories;[33]

7. Testimony declaration of Sonja Perencevic, Plaintiff's President;[34] and

8. Notice of reliance on documents printed from the USPTO electronic database bearing the electronic signature of Mr. Taylor.[35]

B. Defendants' testimony and evidence

1. Notice of reliance on Plaintiff's responses to Defendant Great Concepts' first set of interrogatories;[36]

2. Notice of reliance on Plaintiff's responses to Defendant Great Concepts' first set of requests for admission;[37] and

---

[29] 38 TTABVUE 2-9.

[30] 34 TTABVUE 3-36 and 35 TTABVUE 2-31.

[31] 36 TTABVUE 1-37 and 37 TTABVUE 2-66.

[32] 39 TTABVUE 5-31.

[33] 40 TTABVUE 33-61.

[34] 40 TTABVUE.

[35] 44 TTABVUE.

[36] 41 TTABVUE 6-20.

[37] 41 TTABVUE 22-29.

      3. Notice of reliance on Plaintiff's responses to Defendant Great
         Management Group's first set of interrogatories.[38]

## IV. Entitlement to a statutory cause of action[39]

Even though Defendants in their brief do not contest Plaintiff's entitlement to invoke the statutory causes of action of an opposition and a cancellation, such is an element of the plaintiff's case in every inter partes proceeding. *See Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 2020 USPQ2d 11277 (Fed. Cir. 2020), *cert. denied*, ___ S. Ct. ___ (2021); *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 2020 USPQ2d 10837 (Fed. Cir. 2020), *reh'g en banc denied*, 981 F.3d 1083, 2020 USPQ2d 11438 (Fed. Cir. 2020), *petition for cert. filed*, No. 20-1552 (Apr. 28, 2021); *Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014). To establish entitlement to these statutory causes of action, a plaintiff must demonstrate: (i) an interest falling within the zone of interests protected by the statute and (ii) a reasonable belief in damage proximately caused by the registration of the mark. *Spanishtown Enters.*, 2020 USPQ2d 11388, at *1 (citing *Corcamore*, 2020 USPQ2d 11277, at *4). *See also Empresa Cubana*, 111 USPQ2d at 1062; *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023, 1025 (Fed. Cir. 1999); *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 189 (TTAB 1982).

---

[38] 41 TTABVUE 31-48.

[39] We now refer to what previously had been called standing as "entitlement to a statutory cause of action." But our prior decisions and those of the Federal Circuit interpreting "standing" under §§ 1063 and 1064 remain applicable. *See Spanishtown Enters., Inc. v. Transcend Resources, Inc.*, 2020 USPQ2d 11388, at *2 (TTAB 2020).

Plaintiff has established its entitlement to a statutory cause of action by properly introducing into evidence its pleaded registration for DAN TANA'S for clothing items.[40] *See, e.g., Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000); *N.Y. Yankees P'ship v. IET Prods. & Servs., Inc.*, 114 USPQ2d 1497, 1501 (TTAB 2015).

Also, Plaintiff proved that its pending applications pleaded in the petition, Serial Nos. 86452290 (for the mark DAN TANA'S for bar and restaurant services) and 86452328 (for the mark DAN TANA'S for marinara sauce), have been refused registration based on Registration No. 2929764 for the mark DANTANNA'S for "steak and seafood restaurant" owned by Great Concepts.[41] *See Lipton Indus.*, 213 USPQ at 189 ("Thus, to have standing in this case, it would be sufficient that [plaintiff] prove that it filed an application and that a rejection was made because of [defendant's] registration."); *ShutEmDown Sports Inc. v. Lacy*, 102 USPQ2d 1036, 1041 (TTAB 2012) (pending application refused registration based on a likelihood of confusion with mark in respondent's registration shows petitioner has real interest in proceeding, and has standing); *DaimlerChrysler Corp. v. Am. Motors Corp.*, 94 USPQ2d 1086, 1087 (TTAB 2010); *Continental Grain Co. v. Strongheart Prods. Inc.*, 9 USPQ2d 1238, 1238 (TTAB 1988) ("There is no question that petitioner . . . whose applications have been refused registration by virtue of respondent's

---

[40] 33 TTABVUE 6-57.

[41] 34 TTABVUE 3-36, 35 TTABVUE 2-31, 36 TTABVUE 1-37 and 37 TTABVUE 2-66.

registrations, has standing to be heard on the question of cancellation of those registrations.").

## V. Fraud

### A. Applicable law, facts and claims

Fraud in procuring or maintaining a trademark registration occurs when an applicant for registration, or a registrant in a post registration setting, knowingly makes a false, material representation of fact in connection with an application to register, or a post registration document, with the intent of obtaining or maintaining a registration to which it is otherwise not entitled. *In re Bose Corp.*, 580 F.3d 1240, 1245, 91 USPQ2d 1938, 1939-40 (Fed. Cir. 2009); *Torres v. Cantine Torresella S.r.l.*, 808 F.2d 46, 1 USPQ2d 1483, 1484 (Fed. Cir. 1986); *Embarcadero Techs., Inc. v. Delphix Corp.*, 117 USPQ2d 1518 (TTAB 2016). A party alleging fraud in the procurement or maintenance of a registration bears the heavy burden of proving fraud with clear and convincing evidence. *In re Bose*, 91 USPQ2d at 1243 (quoting *Smith Int'l, Inc. v. Olin Corp.*, 209 USPQ 1033, 1044 (TTAB 1981)). For example, the Board will not find fraud if the evidence shows that a false statement was made with a reasonable and honest belief that it was true, rather than an intent to mislead the USPTO into issuing a registration to which the applicant was not otherwise entitled. *See id.*; *see also Woodstock's Enters. Inc. (Cal.) v. Woodstock's Enters. Inc. (Or.)*, 43 USPQ2d 1440, 1443 (TTAB 1997), *aff'd,* 152 F.3d 942 (Fed. Cir. 1998).

The Court of Appeals for the Federal Circuit has held that intent to deceive is an indispensable element of the analysis in a fraud case. *See In re Bose*, 91 USPQ2d at

1941. The standard for finding intent to deceive is stricter than the standard for negligence or gross negligence, and evidence of deceptive intent must be clear and convincing. *Id.* However, the Federal Circuit has left open the question whether reckless disregard of the truth or falsity of a material statement made in a filing with the USPTO satisfies the intent to deceive requirement. *In re Bose*, 91 USPQ2d at 1941 n.2. We find the facts of this case at a minimum demonstrate reckless disregard, and hold as a matter of law that reckless disregard satisfies the requisite intent for fraud on the USPTO in trademark matters.

In *Bose*, the declarant included a false statement regarding use of a mark in commerce in the maintenance filing. However, the Federal Circuit concluded that there was no intent to deceive, because the declarant did not have guidance from prior rulings by the USPTO or any court as to whether the circumstances relied on as indicating use in commerce were sufficient. *Id.* Here, as discussed infra, both the USPTO, through this Board, and the Court of Customs and Patent Appeals have addressed the importance of avoiding false statements in a Section 15 affidavit. The case law is clear that false statements are material to the benefits accorded a registration under Section 15 because the public and the courts rely on registration information, including information related to Section 15 and that such false statements in the Section 15 filing and supporting declaration cannot be characterized as the result of careless reading or misunderstanding of the words.

The basis for Plaintiff's fraud claim is that when Great Concepts' counsel, Frederick Taylor, directed preparation of and later filed the Combined Declaration of

Use and Incontestability for Registration No. 2929764 for the mark DANTANNA'S for "steak and seafood restaurant," there were two proceedings pending involving that registration: (i) Cancellation No. 92045947 at the Board; and (ii) Civil Action No. 1:08-CV-975-TWT in the United States District Court for the Northern District of Georgia ("Georgia Civil Action"). Nevertheless, the declaration Mr. Taylor caused to be prepared and filed states falsely there were no such proceedings pending. According to Plaintiff, Mr. Taylor, as signer of the declaration on behalf of Great Concepts, "knowingly made the false statement in the Declaration with the intent that the USPTO would rely on it and to induce the USPTO to accept the Declaration."[42]

Section 15 of the Trademark Act "provide[s] a means for the registrant to quiet title in the ownership of his mark." *Park 'n Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 224 USPQ 327, 331 (1985). To obtain the benefits of Section 15, a registrant must submit a sworn declaration asserting, among other things, that "there is no proceeding involving said rights pending in the United States Patent and Trademark Office or in a court and not finally disposed of."[43] 15 U.S.C. § 1065.

A false Section 15 affidavit/declaration, when relied on by the USPTO,[44] allows a registrant to obtain a new right which it would not otherwise have, specifically, the

---

[42] Petition for Cancellation ¶36 (1 TTABVUE 9).

[43] "[S]aid rights" refer "to the owner's claim of ownership of [a registered] mark for [the goods or services in the registration], or to the owner's right to register the same or to keep the same on the register." *See* 15 U.S.C. § 1065.

[44] "The USPTO does not 'accept' § 15 affidavits or declarations. *Arman's Sys., Inc. v. Armand's Subway, Inc.*, 215 USPQ 1048, 1050 n.2. (TTAB 1982). Rather, the USPTO reviews the affidavit or declaration to determine whether its contents are consistent with the requirements of the statute and rules (e.g.*,* whether it is signed, whether it was filed at an

right to have its registration, in litigation, accepted as conclusive evidence, rather than merely prima facie evidence, of the registrant's exclusive right to use the registered mark in commerce. *See* Trademark Act Section 33, 15 U.S.C. § 1115(b) ("To the extent that the right to use the registered mark has become incontestable under section 15, the registration shall be conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce.") Thus, it is well-settled that the inclusion of false statements in a Section 15 affidavit/declaration is material, and if made with the relevant degree of intent constitutes fraud warranting cancelation of the involved registration under Section 14(3) of the Trademark Act, 15 U.S.C. § 1064(3). *See Crown Wallcovering Corp. v. Wall Paper Mfrs. Ltd.*, 188 USPQ 141, 144 (TTAB 1975); *see also Consorzio del Prosciutto di Parma v. Parma Sausage Prods. Inc.*, 23 USPQ2d 1894, 1898-99 n.6 (TTAB 1992); *Smith Int'l, Inc. v. Olin Corp.*, 209 USPQ at 1048 (TTAB 1981) ("[F]raudulent misconduct can be attributed to Smith by accepting the benefits of Section 15, knowing that it was not entitled to them … and not taking any action to correct the Office records until the counterclaim was filed.").

The facts listed below are not in dispute:

1. On March 8, 2010, Defendant Great Concepts filed a Combined Declaration of Use and Incontestability under Sections 8 & 15 bearing the signature of

---

appropriate time, and whether the §15 claims are properly set forth), and then acknowledges a complete and sworn-to filing. *See* 37 C.F.R. § 2.167.

attorney Fredrick K. Taylor, stating as a fact that "no proceeding involving said rights pending and not disposed of in either the U.S. Patent and Trademark Office or the courts exists"; and repeating in the supporting declaration made under 18 U.S.C. Section 1001, that *"there is no proceeding involving said rights pending and not disposed of either in the U.S. Patent and Trademark Office or in the courts."* (emphasis in original);[45]

2. At that time, Mr. Taylor was not aware of the legal requirements for filing a Section 15 Declaration with the USPTO;[46]

3. Mr. Taylor knew when he filed the Combined Declaration that both a Board proceeding and civil action were pending against Defendant Great Concepts which involved its right to register and use the mark DANTANNA'S;[47]

4. On March 26, 2010, the USPTO accepted the Section 8 Declaration of Use and acknowledged the Section 15 Declaration of Incontestability filed by Mr. Taylor on behalf of Defendant Great Concepts; and

---

[45] The combined declaration, as shown in the electronic TSDR file for the registration, is attached as an Appendix and available via the USPTO web page:

https://tsdr.uspto.gov/documentviewer?caseId=sn78259855&docId=81520100309131736#docIndex=6&page=1

[46] Taylor Discovery Dep., p. 43 (30 TTABVUE 46). Later in the deposition Mr. Taylor stated he "would have to consult the statute" to determine the requirements for a Section 15 Declaration. *Id.* at p. 45 (30 TTABVUE 48).

[47] Taylor Discovery Dep., pp. 28-29, 31, 57-58 (30 TTABVUE 31-32, 34, 60-61); *see also* Clapp Discovery Dep., p. 64 (32 TTABVUE 67) (Frederick Taylor "defended us against the initial cancelation.").

Defendant Great Concepts admits in its brief that "the Prior Cancellation Proceeding and the Civil Action were still pending when the Declaration was filed." Defendants' Brief, pp. 6-7 (52 TTABVUE 12-13).

5. In this proceeding, Mr. Taylor testified that he did not review the Combined Declaration "carefully enough to see that the statement is in [t]here incorrectly."[48] That is, although he knew the repeated statement regarding other proceedings was false, he did not read the filing closely enough to realize the statement was in the filing and supporting declaration.[49]

6. Neither Mr. Taylor, nor Defendant Great Concepts, notified the USPTO about the false statement in the Section 15 Declaration of Incontestability.

We also note three facts regarding Defendant's failure to correct the declaration. First, Mr. Taylor's paralegal forwarded to Mr. Taylor the electronic receipt provided upon filing of the Combined Declaration, with the email subject listed as "DANTANNA'S – Combined Declaration of Use and Incontestability (Sections 8 & 15)."[50] The receipt summarized the contents of the Combined Declaration, including recitation of the statement regarding other proceedings, and explained the means for remedying any error in the information.[51]

---

[48] Taylor Discovery Dep., pp. 57-59 (30 TTABVUE 60-62).

[49] *Id.* at p. 59 (30 TTABVUE 62). While counsel for Great Concepts references a "box not checked," as the apparent reason the statement in question found its way into the filing in question, the statement is a mystery to us, in that neither the Combined 8 & 15 form, nor the supporting declaration contains any check boxes.

[50] Modelo Dep. Exhibit 7 (31 TTABVUE 81).

[51] *Id.* (31 TTABVUE 82).

Second, Plaintiff made Defendant aware of the mistake in the Section 15 Declaration of Incontestability at issue in February 2014 when Plaintiff's counsel discussed the falsity of the declaration with Defendant's counsel.[52]

Third, Defendant was aware of the mistake in the Section 15 Declaration of Incontestability at least as early as July 29, 2015, the filing date of the Petition for Cancellation wherein Plaintiff alleged,

> The statement in the Declaration signed and filed by Attorney Taylor on March 8, 2010 regarding pending proceedings, namely that there was "no proceeding involving said rights [to register the same or keep the same on the register] pending and not disposed of either in the U.S. Patent and Trademark Office or in the courts," was false.[53]

In its Answer, Defendant admitted the above-quoted allegation.[54]

The essence of Plaintiff's fraud claim is that Mr. Taylor falsely stated that there were no proceedings pending against Registration No. 2929764 when he filed the Combined Declaration; that Mr. Taylor did not familiarize himself with the contents of the Section 15 declaration he signed; as a result, he did not ensure the Combined Declaration's accuracy; and, therefore, Mr. Taylor acted with "willful blindness" as to the contents of the Combined Declaration and whether it may have contained

---

[52] Clapp Dep. pp. 73-74 (32 TTABVUE 76-77); Defendant's response to interrogatory Nos. 6 (39 TTABVUE 12) ("[Defendant] states in response to Interrogatory No. 6 that [Defendant's] Business Managers first learned via a telephone call from counsel at or around February 17, 2014 that the Declaration contained an inaccurate statement."); Defendant's response to interrogatory No. 7 (39 TTABVUE 13) ("[N]o one from [Defendant's law firm] knew that the Declaration contained an inaccurate statement until being so informed by [Plaintiff's] counsel at a meeting that took place on or around February 17, 2014.").

[53] Petition for Cancellation ¶28 (1 TTABVUE 8).

[54] Defendant's Answer in the Petition for Cancellation ¶28 (15 TTABVUE 4).

incorrect or false statements; or, in the alternative, that Mr. Taylor acted in "reckless disregard" as to the truth or falsity of the statements in the Combined Declaration because he did not know what he was signing and he failed to make any inquiry regarding the accuracy of what he signed.[55]

### B. Reckless disregard

"Reckless disregard" is defined as the "conscious indifference to the consequences of an act." *See* BLACK'S LAW DICTIONARY (11th ed. 2019) under "Disregard." The RESTATEMENT OF TORTS defines "recklessness" as the "conscious disregard" of a substantial risk of harm. RESTATEMENT (SECOND) OF TORTS § 500 (1965).

A declarant is charged with knowing what is in the declaration being signed, and by failing to make an appropriate inquiry into the accuracy of the statements the declarant acts with a reckless disregard for the truth. *See Standard Knitting, Ltd. v. Toyota Jidosha K.K.*, 77 USPQ2d 1917, 1928 (TTAB 2006). In *Standard Knitting*, the Board found that the opposer's Chief Operating Officer "clearly understood" that use of a mark meant use in the United States and that "[t]his is not a situation where opposer misunderstood the significance of the statements it signed. Rather, opposer disregarded the significance." *Id.* at 1927. Here, Mr. Taylor disregarded the contents of the Combined Declaration he attested to under 18 U.S.C. Section 1001, notwithstanding that at that time he did so he was not aware of the legal requirements for a Section 15 Declaration.[56] He filed with the USPTO a Combined

---

[55] Plaintiff's Brief, p. 28 (51 TTABVUE 30).

[56] Seven years later, and even after the significance of the false statement in the Combined Declaration had been brought to Defendant's attention, Mr. Taylor still maintained he would

Declaration of Use and Incontestability, which included both the contents required for such and a supporting sworn declaration under 18 U.S.C. Section 1001, each of which contained a statement he knew was false; but, he claimed he did not read the contents or supporting declaration closely enough to be aware the false statement was in the declaration. In other words, Mr. Taylor paid little, or no, attention to the document he was signing under oath and thereby disregarded the significance of the benefits he was obtaining for his client. By failing to ascertain and understand the import of the document he was signing, far from conscientiously fulfilling his duties as counsel, Mr. Taylor acted in reckless disregard for the truth; nor did he take any action to remedy the error once it was brought to his attention. Mr. Taylor was especially reckless because he was admittedly unfamiliar with the requirements for filing a Section 15 Declaration.

To find otherwise could encourage declarants to conclude that such disregard carries no consequence and they can fail to read documents they are signing without penalty. "Statements made with such degree of solemnity clearly are or should be investigated thoroughly prior to signature and submission to the USPTO." *Standard Knitting*, 77 USPQ2d at 1927-28 (citation omitted); *see also Duffy-Mott Co. v. Cumberland Packing Co.*, 424 F.2d 1095, 165 USPQ 422, 425 (CCPA 1970) (finding that false statement in a Section 15 affidavit "can scarcely be characterized as mere carelessness or misunderstanding to be winked at as of no importance," and, thus,

---

have to consult the statute to confirm the requirements for a Section 15 Declaration. Taylor Discovery Dep., p. 45 (30 TTABVUE 48).

holding that a sanction was necessary "to deter the further development of such a cavalier attitude toward statements in affidavits under section 15."); *Herbaceuticals, Inc. v. Xel Herbaceuticals, Inc.*, 86 USPQ2d 1572, 1577 (TTAB 2008). Documents submitted to the USPTO must be investigated **and read** thoroughly before filing, because the party

> (b) By presenting to the Office . . . any paper . . . is certifying that -
>
> (1) All statements made therein of the party's own knowledge are true, all statements made therein on information and belief are believed to be true, and all statements made therein are made with the knowledge that whoever, in any matter within the jurisdiction of the Office, knowingly and willfully falsifies, conceals, or covers up by any trick, scheme, or device a material fact, or knowingly and willfully makes any false, fictitious, or fraudulent statements or representations, or knowingly and willfully makes or uses any false writing or document knowing the same to contain any false, fictitious, or fraudulent statement or entry, shall be subject to the penalties set forth under 18 U.S.C. 1001 and any other applicable criminal statute, and violations of the provisions of this section may jeopardize the probative value of the paper; and
>
> (2) To the best of the party's knowledge, information and belief, formed after an inquiry reasonable under the circumstances,
>
> (i) The paper is not being presented for any improper purpose, such as to harass someone or to cause unnecessary delay or needless increase in the cost of any proceeding before the Office;
>
> (ii) The other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(iii) The allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(iv) The denials of factual contentions are warranted on the evidence, or if specifically so identified, are reasonably based on a lack of information or belief.

37 C.F.R § 11.18.

In USPTO trademark cases involving allegations of fraud, the Federal Circuit has held that the intent to deceive must be willful. *In re Bose Corp.*, 91 USPQ2d at 1940. The Supreme Court has held that the "standard civil usage" of "willful" includes reckless behavior. *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57-58, 127 S. Ct. 2201, 2209 (2007); *accord McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 132-33, 108 S. Ct. 1677, 100 L. Ed. 2d 115 (1988) (concluding that willful violations of the Fair Labor Standards Act include reckless violations); *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 128, 105 S. Ct. 613, 83 L. Ed. 2d 523 (1985) (same, as to a liquidated damages provision of the Age Discrimination in Employment Act of 1967). Significantly, the Court held that this definition comports with the common law usage, "which treated actions in 'reckless disregard' of the law as 'willful' violations.'" *Safeco*, 551 U.S. at 58, 127 S. Ct. at 2209 (citing W. Keeton, D. Dobbs, R. Keeton, & D. Owen, PROSSER AND KEATON ON LAW OF TORTS § 34, p. 212 (5th ed. 1984) ("Although efforts have been made to distinguish" the terms "willful," "wanton," and "reckless," "such distinctions have consistently been ignored, and the three terms have been treated as meaning the same thing, or at least as coming out at the same legal exit.")).

In the *Bose* decision, the Federal Circuit did not address whether proof of reckless disregard would be sufficient to prove intent to deceive, but did note the importance of considering the views of other circuits, *Bose*, 91 USPQ2d at 1940 ("Several of our sister circuits have also required proof of intent to deceive before cancelling a trademark registration."), and we therefore consider the views of other circuits on reckless disregard:[57]

● The Second Circuit has explained that: "Although the Supreme Court has never held that reckless disregard suffices for 10(b) liability, '[e]very Court of Appeals that has considered the issue has held that a plaintiff may meet the scienter requirement by showing that the defendant acted intentionally or recklessly, though the [c]ircuits differ on the degree of recklessness required.'" *In re Bernard L. Madoff Inv. Sec. LLC*, __ F.4th ___, 2021 WL 3854761 (2d Cir. August 30, 2021) slip opinion at 42-43 (citing *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 n.3 (2007) and *S. Cherry St. LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) ("This court has … long held that the scienter element can be satisfied by a strong showing of reckless disregard for the truth.")). *See also In re Bonnanzio*, 91 F.3d 296, 301 (2d Cir. 1996) where the Second Circuit held "intent to deceive can be inferred from the totality of the circumstances, including reckless disregard."

---

[57] In addition, the Federal Circuit, in interpreting what constitutes a "willful" tax violation justifying penalties under 31 U.S.C. § 5321(a)(5)(A), has held that willfulness includes recklessness. *Norman v. U.S.* (Fed. Cir. 2019) (also noting that failure to read a tax return "is of no import" to whether a taxpayer acted willfully because "a taxpayer who signs a tax return will not be heard to claim innocence for not having actually read the return, as he or she is charged with constructive knowledge of its contents," quoting *Greer V. Comm'r of Internal Revenue*, 595 F. 3d 338, 347 n.4 (6th Cir. 2010)).

● The Eleventh Circuit has also held that willfulness includes reckless disregard. *United States v. Rum*, 995 F.3d 882, 889 (11th Cir. 2021) ("Following our precedent interpreting the analogous language in [26 U.S.C.] § 6672, we hold that willfulness in [31 U.S.C.] § 5321 includes reckless disregard of a known or obvious risk. In so doing, we join with every other circuit court that has interpreted this provision.").

● The Court of Appeals for the District of Columbia has held that reckless disregard may be a proxy for intent, otherwise "it might be all too easy for the wrongdoer to deliberately blind himself to the consequences of his tortious action." *Saba v. Compagnie Nationale Air France*, 78 F.3d 664, 668 (D.C. Cir. 1996) (citing *Am. Airlines, Inc. v. Ulen*, 186 F.2d 529, 533 (D.C. Cir. 1949) (approving jury instruction to the effect that "if the carrier, or its employees or agents … performed that act with reckless and wanton disregard of its probable consequences, then that would constitute willful misconduct)).

● The Tenth Circuit has held that intent to defraud may be established through proof of a violation of the Federal Odometer Act made with the specific intent to deceive or a reckless disregard for the vehicle's actual mileage. *See CDM Auto Wholesale, Inc. v. Jensen*, 31 F. App'x 621 (10th Cir. 2002) (citing *Haynes v. Manning*, 917 F.2d 450, 452-53 (10th Cir. 1990)). In matters of trademark registration and maintenance, where the USPTO relies on declarations to be complete, accurate, and truthful, we hold that reckless disregard is equivalent to intent to deceive and satisfies the intent to deceive requirement. The vast volume of trademark application and registration maintenance filings made with the USPTO is such that the agency

typically cannot actively investigate the truth or falsity of individual declarations. The agency, as well as applicants and registrants, and all who rely on the accuracy of the Registers of marks and the submissions made to the USPTO in furtherance of obtaining or maintaining registration, must be able to rely on declarations and the truth of their contents. The applicable law cannot be read to permit applicants and registrants to recklessly disregard the contents of sworn declarations and sign them without consequence for the inclusion of false statements that will be relied on by the USPTO. "The benefits of registration are [too] substantial." *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 113 USPQ2d 2045, 2056 (2015).

> Registration is significant. The Lanham Act confers "important legal rights and benefits" on trademark owners who register their marks. 3 McCarthy §19:3, at 19-21 see also *id.,* §19:9, at 19-34 (listing seven of the "procedural and substantive legal advantages" of registration). Registration, for instance, serves as "constructive notice of the registrant's claim of ownership" of the mark. 15 U.S.C. § 1072. It also is "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate." § 1057(b). And once a mark has been registered for five years, it can become "incontestable." §§ 1065, 1115(b).

*Id*. at 113 USPQ2d at 2048-49.

Even after opposing counsel in these proceedings brought the incorrect filing to Defendant's attention, neither Defendant, Mr. Taylor, nor anyone else, took any

remedial steps.[58] This leads us to find that Mr. Taylor intended to file just what he filed, regardless of its accuracy.

Therefore, we find that Attorney Taylor's conduct constitutes reckless disregard, which is the legal equivalent of finding that Defendant Great Concepts had the specific intent to deceive the USPTO. In sum, Great Concepts submitted the Section 15 declaration containing false material representations of fact with the intent to deceive the USPTO.

We grant the Petition to Cancel Registration No. 2929764 for the mark DANTANNA'S for "steak and seafood restaurant" on the ground of fraud.

## VI. Likelihood of Confusion

### A. Priority

As noted above, Plaintiff is relying on its common law rights in the mark DAN TANA'S for restaurant services and marinara sauce. Sonja Perencevic, Plaintiff's President, testified that Plaintiff's predecessor-in-interest had been using the mark DAN TANA'S for restaurant services since at least as early as 1964 and for marinara sauce since at least as early as January 2012.[59] Defendant Great Management Group did not cross examine Ms. Perencevic. "Oral testimony [or in this case, testimony in a written declaration], if sufficiently probative, is normally satisfactory to establish

---

[58] The timing of the status inquiry by Fua Akeli, on behalf of Lisel Ferguson, regarding the status of the Board proceedings, the day after the filing of the Section 8 Declaration at issue, leads us to find that Ms. Ferguson was aware that something was amiss with the declaration. Taylor Discovery Dep., pp. 76-78 (30 TTABVUE 76-81); Modelo Discovery Dep., pp. 56-57 and Exhibit 11 (31 TTABVUE 59-60 and 92-93).

[59] Perencevic Testimony Decl. ¶¶3, 5 and 10 (40 TTABVUE 5-6).

priority of use in a trademark proceeding." *Powermatics, Inc. v. Globe Roofing Prods. Co.*, 341 F.2d 127, 144 USPQ 430, 432 (CCPA 1965); *see also Coach Builders, Inc. v. SPV Coach Co.*, 123 USPQ2d 1175, 1184 (TTAB 2017) (testimony of a single witness may suffice to establish priority of use); *Nat'l Bank Book Co. v. Leather Crafted Pros., Inc.*, 218 USPQ 826, 828 (TTAB 1993) (acknowledging that oral testimony may be sufficient to prove the first use of a party's mark when it is based on personal knowledge, it is clear and convincing, and it has not been contradicted). Ms. Perencevic's testimony is clear and convincing and it has not been contradicted. Therefore, her testimony is probative and persuasive.

The filing date for the applications at issue is October 24, 2014. As best we understand Mr. Clapp's testimony, Great Management Group and Dantanna's CNN Center, LLC opened the DANTANNA'S restaurant in the CNN Center in March 2009,[60] and Great Management Group and Dantanna's Tavern, LLC opened the DANTANNA'S TAVERN in the Sandy Springs section of Atlanta in July 2014.[61] If we consider the DANTANNA'S restaurant in the Buckhead section of Atlanta operated by Great Concepts, even though Mr. Clapp insists that Registration No. 2929764 for the mark DANTANNA'S for "steak and seafood restaurant" is owned by Great Concepts and not Great Management Group,[62] that restaurant opened October

---

[60] Clapp Discovery Dep., p. 21 (32 TTABVUE 24).

[61] *Id.* at p. 22 (32 TTABVUE 25).

[62] *Id.* at pp. 58, 127, 130-132 (32 TTABVUE 61, 130, 133-135).

29, 2003.[63] Accordingly, under any scenario, Plaintiff has prior use of DAN TANA'S for restaurant services.

Great Management Group did not proffer any testimony or evidence regarding its first use of the mark DANTANNA'S for "spices and spice rubs," therefore, the earliest date on which it may rely is the filing date of its application. *See UMG Recordings Inc. v. O'Rourke*, 92 USPQ2d 1042, 1046-47 (TTAB 2009); *Life Zone Inc. v. Middleman Grp. Inc.*, 87 USPQ2d 1953, 1960 (TTAB 2008). Accordingly, Plaintiff first used its DAN TANA'S mark for marinara sauce (January 2012) prior to the priority date that may be claimed by Great Management for spices and rubs (October 24, 2014).

In summary, Plaintiff has prior use of its mark DAN TANA'S for restaurant services over Great Management Group's use of its DANTANNA'S mark for "spices and spice rubs" and DANTANNA'S TAVERN for "restaurant and bar services." Also, Plaintiff has prior use of its mark DAN TANA'S for marinara sauce over Great Management Group's use of DANTANNA'S for "spices and spice rubs."

C.     Likelihood of Confusion Factors

Our determination under Section 2(d) is based on an analysis of all of the probative facts in evidence that are relevant to the factors bearing on the likelihood of confusion. *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973) ("*DuPont*") (cited in *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 113 USPQ2d at 2049); *see also In re Majestic Distilling Co.*, 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003). "In discharging this duty, the thirteen

---

[63] *Id.* at p. 21 (32 TTABVUE 24).

*DuPont* factors 'must be considered' 'when [they] are of record.'" *In re Guild Mortg. Co.*, 912 F.3d 1376, 129 USPQ2d 1160, 1162 (Fed. Cir. 2019) (quoting *In re Dixie Rests. Inc.*, 105 F.3d 1405, 41 USPQ2d 1531, 1533 (Fed. Cir. 1997) and *DuPont*, 177 USPQ at 567). "Not all *DuPont* factors are relevant in each case, and the weight afforded to each factor depends on the circumstances. Any single factor may control a particular case." *Stratus Networks, Inc. v. UBTA-UBET Commc'ns Inc.*, 955 F.3d 994, 2020 USPQ2d 10341, at *3 (Fed. Cir. 2020) (citing *Dixie Rests.*, 41 USPQ2d at 1406-07).

Each case must be decided on its own facts and the differences are often subtle ones." *Indus. Nucleonics Corp. v. Hinde*, 475 F.2d 1197, 177 USPQ 386, 387 (CCPA 1973). In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods or services. *See In re Chatam Int'l Inc.*, 380 F.3d 1340, 71 USPQ2d 1944, 1945-46 (Fed. Cir. 2004); *Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by § 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks."). *See also In re i.am.symbolic, llc*, 866 F.3d 1315, 123 USPQ2d 1744, 1747 (Fed. Cir. 2017) ("The likelihood of confusion analysis considers all *DuPont* factors for which there is record evidence but 'may focus … on dispositive factors, such as similarity of the marks and relatedness of the goods.'") (quoting *Herbko Int'l v. Kappa Books, Inc.*, 308 F.3d 1156, 64 USPQ2d 1375, 1380 (Fed. Cir. 2002)).

1. Strength of Plaintiff's mark DAN TANA'S, including the number and nature of similar marks in use on similar goods and services.

In determining the strength of a mark, we consider both its inherent strength based on the nature of the mark itself and its commercial strength, based on the marketplace recognition of the mark. *See In re Chippendales USA, Inc.*, 622 F.3d 1346, 96 USPQ2d 1681, 1686 (Fed. Cir. 2010) ("A mark's strength is measured both by its conceptual strength (distinctiveness) and its marketplace strength (secondary meaning)."); *Top Tobacco, L.P. v. N. Atl. Operating Co.*, 101 USPQ2d 1163, 1171-72 (TTAB 2011) (the strength of a mark is determined by assessing its inherent strength and its commercial strength); *Tea Bd. Of India v. Republic of Tea Inc.*, 80 USPQ2d 1881, 1899 (TTAB 2006); MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:83 (5th ed. 2019) ("The first enquiry focuses on the inherent potential of the term at the time of its first use. The second evaluates the actual customer recognition value of the mark at the time registration is sought or at the time the mark is asserted in litigation to prevent another's use.").

Market strength is the extent to which the relevant public recognizes a mark as denoting a single source. *Tea Bd. Of India*, 80 USPQ2d at 1899. In other words, it is similar to acquired distinctiveness. Market strength may be measured indirectly by, inter alia, unsolicited media coverage. *See Tao Licensing, LLC v. Bender Consulting Ltd.*, 125 USPQ2d 1043, 1056 (TTAB 2017) (finding petitioner's evidence of commercial strength included unsolicited media coverage). *Cf. ProQuest Info. & Learning Co. v. Island*, 83 USPQ2d 1351 (TTAB 2007) (finding widespread unsolicited media is probative of fame).

For purposes of analysis of likelihood of confusion, a mark's renown "varies along a spectrum from very strong to very weak." *Joseph Phelps Vineyards, LLC v. Fairmont Holdings, LLC*, 857 F.3d 1323, 122 USPQ2d 1733, 1734 (Fed. Cir. 2017) (internal quotations omitted). The proper standard is the mark's "renown within a specific product market," *id.*, and "is determined from the viewpoint of consumers of like products," *id.* at 1735, and not from the viewpoint of the general public.

Dan Tana is a living individual and Plaintiff's predecessor-in-interest.[64] Great Management Group proffered no countervailing meaning. When the name Dan Tana is used as a trademark to identify and to distinguish restaurant services and marinara sauce, it is a distinctive term because it does not describe, nor suggest, any quality or characteristic of marinara sauce or restaurant services. *See Brooks v. Creative Arts by Calloway, LLC*, 93 USPQ2d 1823, 1828-29 (TTAB 2009) ("A personal name mark, unless it is primarily merely a surname, is registrable on the Principal Register without a showing of secondary meaning, and thus is deemed to be inherently distinctive under the Lanham Act if the record shows that it is used in a manner that would be perceived by purchasers as identifying the services in addition to the person."), *rev'd on other grounds*, 2012 WL 6732907 (S.D.N.Y. 2012). Accordingly, DAN TANA'S, when used in connection with marinara sauce and restaurant services, is inherently distinctive and conceptually strong.

With respect to commercial strength, Plaintiff introduced the following evidence:

---

[64] Perencevic Testimony Decl. ¶3 (40 TTABVUE 5).

(i) Plaintiff, or its predecessor-in-interest, has operated a DAN TANA'S restaurant in West Hollywood, California since at least as early as 1964.[65]

(ii) "[Plaintiff's] DAN TANA'S restaurant is a favorite of Hollywood and film industry personalities and professionals, regularly receives extensive unsolicited publicity and has received such unsolicited publicity for many years, and has been promoted in nationally-distributed media as one of the 10 best restaurants for celebrity sightings in Los Angeles, California."[66]

(iii) In September 2014, THE HOLLYWOOD REPORTER published an article entitled "Dan Tana's Turns 50: Secrets Behind Hollywood's Star-Studded Eatery."[67]

---

[65] *Id.* at ¶3 (40 TTABVUE 5).

[66] *Id.* at ¶13 (40 TTABVUE 7).

[67] *Id.* at ¶17 (40 TTABVUE 7). Plaintiff sought to introduce a copy of the article and an accompanying video by presenting an Internet link. Providing only a website address or hyperlink to Internet materials is insufficient to make such materials of record. Trademark Rule 2.122(e)(2), 37 C.F.R. § 2.122(e)(2) ("Internet materials may be admitted into evidence under a notice of reliance in accordance with paragraph (g) of this section, in the same manner as a printed publication in general circulation, so long as the date the internet materials were accessed and their source (e.g., URL) are provided."). Trademark Rule 2.122(e)(1), 37 C.F.R. § 2.122(e)(1), provides that the notice of reliance will be accompanied by a copy of the publication or relevant portion thereof. *See also Safer Inc. v. OMS Invs. Inc.*, 94 USPQ2d 1031, 1039 (TTAB 2010) ("if a document obtained from the Internet identifies its date of publication or date that it was accessed and printed, and its source (e.g., the URL), it may be admitted into evidence pursuant to a notice of reliance in the same manner as a printed publication in general circulation in accordance with Trademark Rule 2.122(e)."); *cf. In re Olin Corp.*, 124 USPQ2d 1327, 1332 n.15 (TTAB 2017); *In re Powermat Inc.*, 105 USPQ2d 1789, 1791 (TTAB 2013)*; In re HSB Solomon Assocs. LLC*, 102 USPQ2d 1269, 1274 (TTAB 2012). Because of the transitory nature of Internet postings, websites referenced only by address or hyperlinks may be modified or deleted at a later date without notification.

(iv) There are "hundreds of [YouTube] videos of celebrities that have been

filmed while dining at DANA TANA'S restaurant."[68]

Plaintiff has failed to prove that its DAN TANA'S mark is commercially strong. While DAN TANA'S restaurant is obviously successful, having been in business since 1964, there is no evidence that its renown, if any, extends beyond the area around West Hollywood, California. Notwithstanding the YouTube videos, Plaintiff failed to introduce any evidence demonstrating that it is known outside of its trading area (e.g., news articles from publications outside of Los Angeles, California or websites based outside of Los Angeles).

With respect to the YouTube videos, there is no testimony or evidence regarding how many people have viewed them.[69] Although Ms. Perencevic asserts that DAN TANA'S receives unsolicited media attention and has been promoted in national

---

*See Safer Inc.*, 94 USPQ2d at 1039. Accordingly, the article and video are not admissible because they were not properly made of record.

[68] Perencevic Testimony Decl. ¶16 and Exhibit E (40 TTABVUE 8 and 43-57).

[69] The YouTube video exhibit states that there are about 61,800 results and each video states the number of "views." (40 TTABVUE 43). However, Internet materials are admissible only to show what has been printed, not the truth of what has been printed. *See Safer*, 94 USPQ2d at 1040; *WeaponX Performance Prods. Ltd. v. Weapon X Motorsports, Inc.*, 126 USPQ2d 1034, 1038 (TTAB 2018). Also, the titles of the YouTube videos indicate that the vast majority of the videos are about celebrities interviewed at DAN TANA'S restaurant rather than DAN TANA'S restaurant being the subject of the video (e.g., "David Arquette & Stevy T at Dan Tana's," "Dorothy Wang Explains Love to Paparazzi before departing Dan Tana's WeHo," "Tom Jones greets fans while arriving at Dan Tana's in West Hollywood"). (40 TTABVUE 43-56). Finally, there is no testimony or evidence that defines the terms "results" or "views." We assume that "results" means videos directly or indirectly referring to DAN TANA'S (although some videos appear to be unrelated to the restaurant) and "views" means the number of times the video has been viewed by someone. Nevertheless, there is no testimony or evidence that puts those results into context or gives them meaning for purposes of analyzing the renown of DAN TANA'S.

media as one of the 10 best restaurants for sighting celebrities, Plaintiff has not introduced any corroborating evidence.[70] Plaintiff also introduced a press release dated September 10, 2014, regarding the 50th anniversary of DAN TANA'S restaurant.[71] The press release has little, if any, probative value because there is no testimony or evidence regarding whether or where the press release was published or how many people had the opportunity to read it. Finally, there is no evidence or testimony regarding Plaintiff's revenues or advertising expenditures.

Great Management Group did not introduce any testimony or evidence regarding similar marks used in connection with similar goods or services.

Considering the record as a whole, including evidence pertaining to both inherent and commercial strength, we find that because Plaintiff's DAN TANA'S mark is an inherently distinctive term, it is appropriately placed in the middle of the "'spectrum from very strong to very weak.'" *Joseph Phelps Vineyards*, 122 USPQ2d at 1734; *see also Bell's Brewery, Inc. v. Innovation Brewing*, 125 USPQ2d 1340, 1347 (TTAB 2017) (finding that opposer's marks were entitled to "the normal scope of protection to which inherently distinctive marks are entitled").

2. The similarity or dissimilarity of the marks.

We now turn to the *DuPont* likelihood of confusion factor focusing on the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation

---

[70] Nevertheless, the YouTube videos discussed above circumstantially support this testimony because the subjects of many of the videos in the results pages submitted are celebrities at DAN TANA'S.

[71] Perencevic Testimony Decl. ¶15 and Exhibit D (40 TTABVUE 8 and 39-41).

and commercial impression. *DuPont*, 177 USPQ at 567. "Similarity in any one of these elements may be sufficient to find the marks confusingly similar." *In re Inn at St. John's, LLC*, 126 USPQ2d 1742, 1746 (TTAB 2018), *aff'd mem.*, 777 F. App'x (Fed. Cir. 2019); *In re Davia*, 110 USPQ2d 1810, 1812 (TTAB 2014); *accord Krim-Ko Corp. v. Coca-Cola Bottling Co.*, 390 F.2d 728, 156 USPQ 523, 526 (CCPA 1968) ("It is sufficient if the similarity in either form, spelling or sound alone is likely to cause confusion.") (citation omitted).

"The proper test is not a side-by-side comparison of the marks, but instead 'whether the marks are sufficiently similar in terms of their commercial impression' such that persons who encounter the marks would be likely to assume a connection between the parties." *Coach Servs. Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1721 (Fed. Cir. 2012); *see also Midwestern Pet Foods, Inc. v. Societe des Produits Nestle S.A.*, 685 F.3d 1046, 103 USPQ2d 1435, 1440 (Fed. Cir. 2012); *San Fernando Elec. Mfg. Co. v. JFD Elec. Components Corp.*, 565 F.2d 683, 196 USPQ 1, 3 (CCPA 1977); *Spoons Rests. Inc. v. Morrison Inc.*, 23 USPQ2d 1735, 1741 (TTAB 1991), *aff'd mem.*, 972 F.2d 1353 (Fed. Cir. 1992).

The proper focus is on the recollection of the average customer, who retains a general rather than specific impression of the marks. *Geigy Chem. Corp. v. Atlas Chem. Indus., Inc.*, 438 F.2d 1005, 169 USPQ 39, 40 (CCPA 1971); *L'Oreal S.A. v. Marcon*, 102 USPQ2d 1434, 1438 (TTAB 2012); *Winnebago Indus., Inc. v. Oliver & Winston, Inc.*, 207 USPQ 335, 344 (TTAB 1980); *Sealed Air Corp. v. Scott Paper Co.*, 190 USPQ 106, 108 (TTAB 1975). Because the relevant goods and services are

marinara sauce, spices and spice rubs, and bar and restaurant services, without any restrictions as to channels of trade or classes of consumers, the average customer is an ordinary consumer.

Great Management Group seeks to register DANTANNA'S and DANTANNA'S TAVERN. Plaintiff's mark is DAN TANA'S.

DANTANNA'S is the dominant portion of the mark DANTANNA'S TAVERN because the word "tavern" is a generic term for a restaurant and bar services, and Great Management Group has accordingly disclaimed the exclusive right to use the word "tavern."[72] It is well-settled that disclaimed, descriptive matter may have less significance in likelihood of confusion determinations. *See Cunningham v. Laser Golf Corp.*, 55 USPQ2d at 1846 ("Regarding descriptive terms, this court has noted that the 'descriptive component of a mark may be given little weight in reaching a conclusion on the likelihood of confusion.'") (quoting *In re Nat'l Data Corp.*, 753 F.2d 1056, 224 USPQ 749, 752 (Fed. Cir. 1985)); *In re Dixie Rests. Inc.*, 41 USPQ2d at 1533-34; *In re Code Consultants, Inc.*, 60 USPQ2d 1699, 1702 (TTAB 2001) (disclaimed matter is often "less significant in creating the mark's commercial impression"). There is nothing improper in stating that, for rational reasons, more or

---

[72] The word "Tavern" is defined as "a place where liquors are sold to be consumed on the premises" and "a public house for travelers and others." Dictionary.com/browse/tavern# based on the RANDOM HOUSE UNABRIDGED DICTIONARY (2019) accessed May 29, 2019. The Board may take judicial notice of dictionary definitions, including online dictionaries that exist in printed format. *In re Cordua Rests. LP*, 110 USPQ2d 1227, 1229 n.4 (TTAB 2014), *aff'd*, 823 F.3d 594, 118 USPQ2d 1632 (Fed. Cir. 2016); *Threshold.TV Inc. v. Metronome Enters. Inc.*, 96 USPQ2d 1031, 1038 n.14 (TTAB 2010); *In re Red Bull GmbH*, 78 USPQ2d 1375, 1378 (TTAB 2006).

less weight has been given to a particular feature of a mark, such as a common dominant element, provided the ultimate conclusion rests on a consideration of the marks in their entireties. *In re Viterra Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012); *Nat'l Data Corp.*, 224 USPQ at 751.

DANTANNA'S and DAN TANA'S are phonetically identical. In addition, they are visually similar. Great Management Group's term DANTANANA'S is presented without a space while Plaintiff's mark has a space between "Dan" and "Tana's." The presence or absence of a space between two terms is usually an inconsequential difference that even if noticed by consumers would not serve to distinguish these marks. *See Mag Instr. Inc. v. Brinkmann Corp.*, 96 USPQ2d 1701, 1714-15 (TTAB 2010) (difference of a single letter does not suffice to distinguish MAG STAR from MAXSTAR); *In re Iolo Techs., LLC*, 95 USPQ2d 1498, 1499 (TTAB 2010) (finding ACTIVECARE and ACTIVE CARE confusingly similar); *cf. In re A La Vieille Russie Inc.*, 60 USPQ2d 1895, 1897 n.2 (TTAB 2001) ("the compound term RUSSIANART is as merely descriptive as its constituent words, 'Russian Art'"). Also, Great Management Group's DANTANNA'S marks have an additional letter "N" in the "-tanna's" portion. Slight differences in marks do not normally distinguish them. *See Mag Instr. Inc.*, *supra*; *In re Great Lakes Canning, Inc.*, 227 USPQ 483, 485 (TTAB 1985) ("Moreover, although there are certain differences between the [marks' CAYNA and CANA] appearance, namely, the inclusion of the letter 'Y' and the design feature in applicant's mark, there are also obvious similarities between them. Considering the similarities between the marks in sound and appearance, and taking into account

the normal fallibility of human memory over a period of time (a factor that becomes important if a purchaser encounters one of these products and some weeks, months, or even years later comes across the other), we believe that the marks create substantially similar commercial impressions."). *See also U.S. Mineral Prods. Co. v. GAF Corp.*, 197 USPQ 301, 306 (TTAB 1977) ("'AFCO' and 'CAFCO,' which differ only as to the letter 'C' in USM's mark, are substantially similar in appearance and sound"); *In re Bear Brand Hosiery Co.*, 194 USPQ 444, 445 (TTAB 1977) ("The mark of the applicant, 'KIKS' and the cited mark 'KIKI' differ only in the terminal letter of each mark. While differing in sound, the marks are similar in appearance and have a somewhat similar connotation"). We find that these minor, peripheral differences do not distinguish the marks. *Cf. Dixie Rests.*, 41 USPQ2d at 1534 ("[R]estaurants are often recommended by word of mouth and referred to orally, [so] it is the word portion of applicant's mark which is more likely to be impressed on the consumer's memory.") (quoting *Giant Food, Inc. v. Nation's Foodservice, Inc.*, 710 F.2d 1565, 218 USPQ 390, 395 (Fed. Cir. 1983)); *In re Appetito Provisions Co.*, 3 USPQ2d 1553, 1554 (TTAB 1987) ("[T]he propensity of persons [is] to try restaurants based on word-of-mouth recommendations.").

The inclusion of the possessive letter "s" at the end of the "Tana" or "-tanna" portion of each mark gives each mark the impression that it is a name: DANTANNA'S, a surname or a combination of "Dan" and "Tanna's;" and DAN TANA'S, a full name. While consumers may or may not perceive identical meanings

and commercial impressions from the marks at issue, the meanings and commercial impressions are similar in that they identify a similar, if not identical, name.

We find that Great Management Group's DANTANNA'S and DANTANNA'S TAVERN marks are very similar to Plaintiff's mark DAN TANA'S in appearance, sound, connotation and commercial impression. We add that we considered DANTANNA'S TAVERN as a whole, but as explained above, consumers would understand "TAVERN" as specifying a type of restaurant, such that its presence in the mark for restaurant services does not detract from the overall impression of the mark as DANTANNA'S.

3. The similarity or dissimilarity and nature of the goods and services; established, likely-to-continue channels of trade; and classes of consumers.

(i) Restaurant services vs. restaurant and bar services

Great Management Group is seeking to register DANTANNA'S TAVERN for restaurant and bar services, and Plaintiff is using DAN TANA'S for restaurant services. The services are in part identical.

Because there are no limitations or restrictions in Great Management Group's description of services in the DANTANNA'S TAVERN application, we must presume that Great Management Group's restaurant and bar services are offered in all channels of trade that would be normal for such services, and that they would be purchased by all potential customers. *See Citigroup Inc. v. Capital City Bank Grp. Inc.*, 637 F.3d 1344, 98 USPQ2d 1253, 1261 (Fed. Cir. 2011); *CBS Inc. v. Morrow*, 708 F.2d 1579, 218 USPQ 198, 199 (Fed. Cir. 1983). This would include the channels of trade and classes of consumers for Plaintiff's restaurant services.

(ii) Marinara sauce vs. spices and spice rubs

Great Management Group is seeking to register DANTANNA'S for "spices and spice rubs," and Plaintiff is using DAN TANA'S for marinara sauce.

Marinara is defined as "a highly seasoned sauce of tomatoes, garlic and spices."[73] Spices are defined as "any class of pungent or aromatic substances of vegetable origin, as pepper, cinnamon, or cloves, used as seasoning, preservatives, etc."[74] Rub is defined, inter alia, as "a combination of spices that is rubbed into the surface of meat before the meat is cooked."[75]

Ms. Perencevic testified that:

> Marinara sauces are frequently used together with spices, and spices are ingredients of marinara sauce, including the DAN TANA'S marinara sauce. The DAN TANA's marinara sauce that has been sold by [Plaintiff] contains as ingredients garlic, sugar, salt, fresh basil and spices. Photographs showing the DAN TANA'S brand marinara sauce are attached hereto as Exhibit C.[76]

One of the photographs from Exhibit C is reproduced below.

---

[73] Dictionary.com based on the RANDOM HOUSE UNABRIDGED DICTIONARY (2019) accessed May 5, 2019.

[74] *Id.*

[75] MERRIAM-WEBSTER (merriam-webster.com/dictionary/rub) accessed May 5, 2019.

[76] Perencevic Testimony Decl. ¶9 and Exhibit C (40 TTABVUE 6 and 35).



A photograph of Great Management Group's DANTANNA'S spice and rub is reproduced below.[77]



A marinara sauce is made, in part, of spices. In fact, spices are a key ingredient of a marinara sauce. Marinara sauce and spices and rubs are used to season foods such

[77] Clapp Discovery Dep. Exhibit 3 (40 TTABVUE 197).

as pasta, meat, chicken and shrimp. Thus, marinara sauce includes spices as ingredients, and marinara sauce and spices have an overlapping purpose or function.

Great Management Group argues that marinara sauce and spices and rubs "are completely different products and are unlikely to be confused for one another."[78] First, goods need not be identical to be found related; rather, they need only be related in such a manner that they could be encountered by the same consumer under situations that would lead to the mistaken belief that they originate from the same source. *Coach Servs. Inc. v. Triumph Learning LLC*, 101 USPQ2d at 1723. Second, with respect to likelihood of confusion, the issue is not whether consumers will confuse the products, but rather whether they will confuse the source of those goods. *In re St. Helena Hosp.*, 774 F.3d 747, 113 USPQ2d 1082, 1086 (Fed. Cir. 2014) (the similarity or dissimilarity and nature of the goods "considers whether 'the consuming public may perceive [the respective goods and services of the parties] as related enough to cause confusion about the source or origin of the goods and services.'") (quoting *Hewlett-Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261, 62 USPQ2d 1001, 1004 (Fed. Cir. 2002) (citing *Recot, Inc. v. M.C. Becton*, 214 F.3d 1322, 54 USPQ2d 1894, 1898 (Fed. Cir. 2000)).

Where, as here, the marks are very similar (DANTANNA'S vs. DAN TANA'S), the degree of similarity between the goods required to support a finding of likelihood of confusion declines. *See In re House Beer, LLC*, 114 USPQ2d 1073, 1077 (TTAB 2015) (citing *In re Shell Oil Co.*, 992 F.2d 1204, 26 USPQ2d 1687, 1688-89 (Fed. Cir. 1993);

---

[78] Defendants' Brief, p. 26 (52 TTABVUE 32).

*Time Warner Entm't Co. v. Jones*, 65 USPQ2d 1650, 1661 (TTAB 2002); and *In re Opus One Inc.*, 60 USPQ2d 1812, 1815 (TTAB 2001)).

Plaintiff's mark DAN TANA'S and Great Management Group's mark DANTANNA'S are used in connection with food items, serve the same purpose (to season foods), and are sold in similar containers. Consumers familiar with DAN TANA'S marinara sauce encountering DANTANNA'S spices and rubs may mistakenly believe that the products emanate from a single source. Therefore, we find that marinara sauce and spices and spice rubs are related.

No testimony or evidence was proffered regarding channels of trade and classes of consumers for Plaintiff's DAN TANA'S marinara sauce. As we noted above, because Great Management Group's description of goods for its DANTANNA'S spices and rubs is not limited to any specific channels of trade or classes of consumers, we must presume that Great Management Group's spices and spice rubs are offered in all channels of trade that would be normal for such goods, and that they would be purchased by all potential customers. *See Citigroup Inc. v. Capital City Bank Grp. Inc.*, 98 USPQ2d at 1261; *CBS Inc. v. Morrow*, 218 USPQ at 199. Because Great Management Group's spices and spice rubs are used for cooking and seasoning food, they would be used by those who cook (e.g., ordinary consumers, restaurants, etc.) and they would be offered in channels of trade to reach those consumers (e.g., by Great Management Group's restaurants, online, mail order, grocery stores, etc.). Likewise, Plaintiff's marinara sauce would be used by cooks seeking to season their food (e.g., ordinary consumers, restaurants, etc.) and it would be offered in channels

of trade to reach those consumers (e.g., Plaintiff's restaurant, online, mail order, grocery stores, etc.). Thus, the channels of trade and classes of consumers for Great Management Group's spices and spice rubs and Plaintiff's marinara sauce could overlap. Moreover, because Great Management Group's identification of spices and spice rubs is unrestricted, they could include the channels of trade and classes of consumers for Plaintiff's marinara sauce.

4. The nature and extent of any actual confusion; and the length of time during and conditions under which there has been concurrent use without evidence of actual confusion.

Great Management Group argues that because Plaintiff's trade area is Hollywood, California, but Great Management Group's trade area is Atlanta, Georgia, there is no likelihood of confusion.[79]

> In the 15 years the Dantanna's restaurants have been in operation in Georgia, there have only been a few inquiries from customers asking if the restaurants were associated with [Plaintiff's] Hollywood restaurant, and not a single instance of anyone coming to [Defendant Great Management Group's] restaurants thinking they were going [to Plaintiff's] Italian-themed restaurant.[80]

The geographic disparity in the parties' trading areas is not, in and of itself, a basis to find that there is no likelihood of confusion. The Board evaluates the marks and their use in terms of potentially nationwide markets when an applicant is seeking a geographically unrestricted registration. *See Giant Food*, 218 USPQ at 393; *Appetito Provisions*, 3 USPQ2d at 1554 n.4 (the Trademark Act "accords a registrant

---

[79] Defendants' Brief, pp. 26-28 (52 TTABVUE 32-34).

[80] *Id.* at pp. 27-28 (52 TTABVUE 33-34).

prima facie exclusive rights in the registered mark for the goods or services recited in the registration throughout the United States regardless of its actual extent of use."); *Peopleware Sys., Inc. v. People-ware, Inc.*, 226 USPQ 320, 321 (TTAB 1985) (noting that "geographical separation of the parties' principal places of business cannot be considered to be of significance in determining registrability of applicant's mark since it seeks a geographically unrestricted registration"). However, as explained below, we may consider geographic scope when assessing whether there was a significant opportunity for actual confusion to occur in the same markets. *See, e.g.*, *Citigroup Inc. v. Capital City Bank Grp., Inc.*, 94 USPQ2d 1645, 1660 (TTAB 2010)*, aff'd*, 637 F.3d 1344, 98 USPQ2d 1253 (Fed. Cir. 2011); *Double Coin Holdings Ltd. v. Tru Dev.*, 2019 USPQ2d 377409, at *9 (TTAB 2019).

David Clapp, Defendants' Principal, testified that, over the past 14 years, there may have been a half-dozen inquiries from customers asking if one of the DANTANNA'S restaurants were associated with the DAN TANA'S restaurant in West Hollywood.[81]

> Well nobody has ever walked in and said, Oh, wait, I thought this was like the one in California. The questions have been broad-based, like, Hey, I know there's a restaurant by this name out in California, do you have anything to do with it.[82]

Such inquiries have little probative value because they are ambiguous and do not clearly provide evidence of consumers who are confused about the source of the

---

[81] Clapp Discovery Dep., p. 105 (32 TTABVUE 108).

[82] *Id.* at p. 106 (32 TTABVUE 109).

services. *See Mini Melts, Inc. v. Reckitt Benckiser LLC*, 118 USPQ2d 1464, 1475 (TTAB 2016) (disregarding inquiry evidence as hearsay or entitled to little weight: "Without direct testimony from these individuals, there is insufficient evidence to ascertain what they were thinking, or what caused their purported confusion."); *Marshall Field & Co. v. Mrs. Fields Cookies*, 25 USPQ2d 1321, 1334 (TTAB 1992) (inquiries as to corporate affiliations are not evidence of confusion because, without more, they "indicate that these persons were aware that [the companies at issue] were two different entities"); *Elec. Water Conditioners, Inc. v. Turbomag Corp.*, 221 USPQ 162, 164 (TTAB 1984) ("That questions have been raised as to the relationship between firms is not evidence of actual confusion of their trademarks.") (citation omitted).

The absence of any reported instances of confusion is meaningful only if the record indicates appreciable and continuous use by Great Management Group of its DANTANNA'S marks for a significant period of time in the same markets as those served by Plaintiff under its mark DAN TANA'S. *See Citigroup Inc.*, 94 USPQ2d at 1660; *Double Coin Holdings*, 2019 USPQ2d 377409, at *9; *Gillette Can. Inc. v. Ranir Corp.*, 23 USPQ2d 1768, 1774 (TTAB 1992). In other words, for the absence of actual confusion to be probative, there must have been a reasonable opportunity for confusion to have occurred. *Double Coin Holdings*, 2019 USPQ2d 377409, at *9; *Barbara's Bakery Inc. v. Landesman*, 82 USPQ2d 1283, 1287 (TTAB 2007) (the probative value of the absence of actual confusion depends upon there being a significant opportunity for actual confusion to have occurred); *Red Carpet Corp. v.*

*Johnstown Am. Enters. Inc.*, 7 USPQ2d 1404, 1406-1407 (TTAB 1988). *Cf. Central Soya Co. v. N. Am. Plant Breeders*, 212 USPQ 37, 48 (TTAB 1981) ("the absence of actual confusion over a reasonable period of time might well suggest that the likelihood of confusion is only a remote possibility with little probability of occurring"). As noted above, Great Management Group did not proffer any testimony or evidence regarding its first use of the mark DANTANNA'S for "spices and spice rubs"; and Mr. Clapp testified that the DANTANNA'S TAVERN mark was used for only two years, between 2014 and 2016.[83]

As far as the record shows, Plaintiff renders its restaurant services in West Hollywood, California, through one restaurant, and Defendant Great Management Group's associated companies render their restaurant services in Atlanta, Georgia, through three restaurants. However, Mr. Clapp testified that the Buckhead (owned by Great Concepts) and CNN Center locations generate significant out-of-town business.

> But in the Buckhead restaurant, there's a very solid local population. And with the hotels and Financial Center right there, we do a tremendous out-of-town business traveler business as well.
>
> At CNN we -- for local events -- sporting, concerts, things like that -- huge local business; huge national and international business when it comes to conventions and other events like that that bring people from out of town.
>
> *          *          *
>
> [Sandy Springs] That's way more local because there isn't a real hotel base there. So, again, it would just be a guess,

---

[83] Clapp Discovery Dep., p. 22 (32 TTABVUE 25).

but I think the majority of the people at Sandy Springs certainly are local.[84]

According to Mr. Clapp, about 50-60% of the business at Buckhead location is local, 30-45% of the business at the CNN Center location is local, and 95% of the business and the Sandy Springs location is local.[85]

As noted above, Plaintiff has not introduced any testimony or evidence regarding its advertising. Great Management Group's associated companies' advertising has been minimal:

> Q. Have you ever conducted any advertisements or promotional campaigns outside the metropolitan Atlanta area for any of your three Dantanna's restaurants?
>
> A. I mean, we've been featured on some national TV shows. We never paid for -- we really don't pay for a whole lot of advertising outside of -- we've paid a local sports talk radio station for a few years to be a segment sponsor with them.
>
> We've done some advertising in publications like Convention and Visitors Bureaus and certainly through online presence. That's one way that we try to reach out. Our sales manager, Sarah Foss, she'll -- conventions are coming into town, and she'll go and work to solicit those people from -- you know, if it's a shoe convention from Nike or whatever.[86]

Based on the differences in the parties' geographic trading areas and the lack of specificity in the testimony and evidence regarding the extent of their advertising, the record does not establish that there has been a reasonable opportunity for

---

[84] Clapp Discovery Dep., p. 144 (32 TTABVUE 147).

[85] *Id.* at pp. 144-145 (32 TTABVUE 147-148).

[86] *Id.* at pp. 145-146 (32 TTABVUE 148-149).

confusion to have occurred, notwithstanding Great Management's claimed 14 years of use. *Cf. Citigroup Inc. v. Capital City Bank Grp. Inc.*, 98 USPQ2d at 1259 (concurrent use in the same trading area for 35 years with plaintiff's renown extending nationwide presented a reasonable opportunity for confusion to have occurred). We find these *DuPont* factors to be neutral.

5. Conclusion

Because the marks are highly similar, the goods are related and are offered in overlapping channels of trade to the same classes of consumers, and because the services are in part identical and are offered in the same channels of trade and to the same classes of consumers, we find that Defendant Great Management Group's marks DANTANNA'S for "spices and spice rubs" and DANTANNA'S TAVERN for "restaurant and bar services" are likely to cause confusion with Plaintiff's mark DAN TANA'S for marinara sauce and restaurant services.

The opposition is sustained under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), and registration to Defendant Great Management Group is refused for both applications.

Because we have sustained the opposition under Section 2(d) of the Trademark Act, we need not decide the false suggestion of a connection claim under Section 2(a) of the Trademark Act. *See Multisorb Tech., Inc. v. Pactiv Corp.*, 109 USPQ2d 1170, 1171 (TTAB 2013) ("Like the federal courts, the Board has generally used its discretion to decide only those claims necessary to enter judgment and dispose of the

case. . . [T]he Board's determination of registrability does not require, in every instance, decision on every pleaded claim.").

**Decision:** The petition to cancel Registration No. 2929764 for the mark DANTANNA'S for "steak and seafood restaurant" on the ground of fraud is granted.

The opposition to the registration of the marks DANTANNA'S (application Serial No. 86434445) and DANTANNA'S TAVERN (application Serial No. 86434461) under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), is sustained.

# APPENDIX

### Combined Declaration of Use and Incontestability under Sections 8 & 15

**To the Commissioner for Trademarks:**

**REGISTRATION NUMBER:** 2929764
**REGISTRATION DATE:** 03/01/2005

**MARK:** DANTANNA'S

The owner, Great Concepts, LLC, having an address of
    2515 Highbrooke Trail
    Duluth, Georgia 30097
    United States
is filing a Combined Declaration of Use and Incontestability under Sections 8 & 15.

For International Class 043, the mark is in use in commerce on or in connection with **all** of the goods or services listed in the existing registration for this specific class; **and** the mark has been continuously used in commerce for five (5) consecutive years after the date of registration, or the date of publication under Section 12(c), and is still in use in commerce on or in connection with **all** goods or services listed in the existing registration for this class. Also, no final decision adverse to the owner's claim of ownership of such mark for those goods or services exists, or to the owner's right to register the same or to keep the same on the register; and, no proceeding involving said rights pending and not disposed of in either the U.S. Patent and Trademark Office or the courts exists.

The owner is submitting one specimen for this class showing the mark as used in commerce on or in connection with any item in this class, consisting of a(n) Electronic screenshot captures of subject mark as used on company's public website and online menu..

**Original PDF file:**
SPN0-209242145130-140748000_._DanatanasWebsiteHome.pdf
**Converted PDF file(s) (1 page)**
Specimen File1
**Original PDF file:**
SPN0-209242145130-140748000_._DantanasDinnerMenu.pdf
**Converted PDF file(s) (1 page)**
Specimen File1

The registrant hereby appoints Frederick K. Taylor of Procopio Cory Haregreaves & Savitch
    530 B Street, Suite 2100
    San Diego, California 92101
    United States
to file this Combined Declaration of Use and Incontestability under Sections 8 & 15 on behalf of the registrant.

A fee payment in the amount of $300 will be submitted with the form, representing payment for 1 class(es), plus any additional grace period fee, if necessary.

### Declaration

*The mark is in use in commerce on or in connection with the goods and/or services identified above, as evidenced by the attached specimen(s) showing the mark as used in commerce. The mark has been in continuous use in commerce for five (5) consecutive years after the date of registration, or the date of publication under Section 12(c), and is still in use in commerce. There has been no final decision adverse to the owner's claim of ownership of such mark, or to the owner's right to register the same or to keep the same on the register; and there is no proceeding involving said rights pending and not disposed of either in the U.S. Patent and Trademark Office or in the courts.*

The undersigned being hereby warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements and the like may jeopardize the validity of this document, declares that he/she is properly authorized to execute this document on behalf of the Owner; and all statements made of his/her own knowledge are true and that all statements made on information and belief are believed to be true.

Signature: /Fred Taylor/    Date: 03/08/2010
Signatory's Name: Frederick K. Taylor
Signatory's Position: Senior Counsel